IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JEREMIAH C. OURS,

          Plaintiff,

                    v.                          Civil Action No. 2:04-cv-89

MICHAEL ASTRUE,
Commissioner of Social Security,

               Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

## I. Introduction

A.     Background

       Plaintiff, Jeremiah C. Ours, (Claimant), filed his Complaint on November 19, 2004,

seeking Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on January

27, 2005.[2]  Claimant filed his Motion for Summary Judgment on August 4, 2005.[3]

Commissioner filed his Motion for Summary Judgment on August 31, 2005.[4]

B.     The Pleadings

       1.     Claimant's Motion for Summary Judgment.

       2.     Commissioner's Motion for Summary Judgment.

---

       [1] Docket No. 1.

       [2] Docket No. 6.

       [3] Docket No. 9.

       [4] Docket No. 10.

C.    <u>Recommendation</u>

I recommend that:

1.    Claimant's Motion for Summary Judgment be DENIED.

2.    Commissioner's Motion for Summary Judgment be GRANTED because Claimant's attorney determined Claimant's parents did not need to testify at the administrative hearing, substantial evidence supports the RFC the ALJ assigned to Claimant, and the ALJ demonstrated a significant number of jobs Claimant can perform in the national economy.

## II.  Facts

A.    <u>Procedural History</u>

Claimant filed an application for disability insurance benefits on April 11, 2002, alleging disability since July 11, 2001.  The application was denied initially and on reconsideration.  Claimant requested review by an ALJ and received a hearing on October 24, 2003.  The ALJ issued a decision unfavorable to Claimant on March 26, 2004.  Claimant requested review by the Appeals Council, but it denied the request.  Claimant filed this action, which proceeded as set forth above.

B.    <u>Personal History</u>

Claimant was twenty three years old on the date of the October 24, 2003 hearing before the ALJ.  Claimant has a high school education.  He has prior relevant work experience as an assembly worker and a laborer.

C.    <u>Medical History</u>

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability: July 11, 2001 – June 30, 2003.[5]

**Thomas E. Stein, ED.D., 6/20/02, Tr. 129**
IQ scores:
Verbal: 91
Performance: 83
Full-scale: 87

The scores are considered valid.

WRAT-3
Reading: 79 (standard score), sixth grade level
Spelling: 84 (standard score), sixth grade level
Arithmetic: 87 (standard score), seventh grade level

The scores are considered valid.

Diagnoses:
Axis I: attention deficit disorder
Axis II: dependent personality traits
Axis III: epilepsy

Prognosis: fair

**Kip Beard, M.D., 7/22/02, Tr. 138**
Impression: seizure disorder, learning disability, according to the claimant's parents

**Physical Residual Functional Capacity Assessment, 8/9/02, Tr. 143**
Exertional limitations: none established
Postural limitations: none established
Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established

Environmental limitations:
        Hazards: avoid concentrated exposure

**Psychiatric Review Technique, 8/14/02, Tr. 151**
Medical disposition: impairments not severe

---

[5] Claimant's disability insurance expired at the end of June 2003.  (Tr. 16).

The claimant suffers from ADHD.

Functional limitation and degree of limitation

      Restriction of activities of daily living, difficulties in maintaining social functioning: none

      Difficulties in maintaining concentration, persistence, and pace: mild

      Episodes of decompensation, each of extended duration: none

**Mental Residual Functional Capacity Assessment, 11/20/02, Tr. 166**

Understanding and memory

      The ability to remember locations and work-like procedures, the ability to understand and remember detailed instructions: moderately limited

      The ability of understand and remember very short and simple instructions: no evidence of limitation

Sustained concentration and persistencec

      The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, the ability to sustain an ordinary routine without special supervision: not significantly limited

      The ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to work in coordination with or proximity to others without being distracted by them, the ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods: moderately limited

      The ability to carry out very short and simple instructions: no evidence of limitation

Social interaction

      The ability to interact appropriately with the general public, the ability to accept instructions and respond appropriately to criticism from supervisors, the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: not significantly limited

      The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes: moderately limited

      The ability to ask simple questions or request assistance: no evidence of limitation

Adaptation

      The ability to set realistic goals or make plans independently of others: not significantly limited

      The ability to respond appropriately to changes in the work setting, the ability to travel in unfamiliar places or use public transportation: moderately limited

      The ability to be aware of normal hazards and take appropriate precautions: no evidence of limitation

**Physical Residual Functional Capacity Assessment, 11/26/02, Tr. 171**

Exertional limitations: none established

Postural limitations
        Climbing ramps/stairs, balancing, stooping, kneeling, crouching, crawling: frequently
        Climbing ladders/ropes/scaffolds: never

Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established

Environmental limitations
        Extreme cold, extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts,
gases, poor ventilation: unlimited
        Hazards: avoid all exposure

**Psychiatric Review Technique, 11/28/02, Tr. 179**
The claimant suffers from ADD/cognitive impairment.

Functional limitation and degree of limitation
        Restriction of activities of daily living: mild
        Difficulties in maintaining social functioning, difficulties in maintaining concentration,
persistence, or pace: moderate

D.      Testimonial Evidence

        Testimony was taken at the October 24, 2003 hearing.  The following portions of the

testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ALJ]

        Q       And this morning I'd like you to tell us, Mr. Ours, what medical problems you

have that keep you from doing, not just the work you've done in the past, but any kind of work

and try to explain how these medical problems affect you so you can do no work whatsoever.

        A       Well, the seizures that I have they make me clumsy.  It's slower to catch onto, I'm

slower to catch onto stuff and then like the average person and I require a lot more rest.  Like I

had to get up early this morning so whenever I go home I'm going to have to like take a nap like

for two or three hours just so I can like go to town tonight with my friends.  Because I'm only

allowed like to go to town on two nights because I require a lot more rest than other people.  I can like give a person like probably two good hours of like hard work but after that it's like I get like real, real tired and I like get kind of like clumsy.   And that's when I get like half a seizure then because - -

Q       How often do you have these seizures?

A       Well, it all depends on the rest I get.

Q       Well, in the last year how many seizures have you had?

A       Well, see, I don't really know when I have a seizure.  Mostly I might but it all depends on my schedule of like rest I get.  See, if I get enough rest, because I like require a lot more rest, so if I get enough rest - -

Q       You get enough rest you don't get seizures?

A       Yeah, it all depends on the rest.  Like it's, like - -

Q       What sort of seizures are they, are they grand mal seizures where you lose consciousness or - -

A       Well, it all depends sometimes.  Sometimes I can have a hard seizure and sometimes -   Q       How many hard seizures have you had in the last year?

A       Well, I was at my computer one day and, I must have not got enough rest, and hit my head on the desk and I was down for like at least five good minutes.  And that's one of the hardest seizures I've had in a long time.

Q       How long ago was that?

A       How long ago it was?  I'd say it's been probably a month ago.  But that was one of the days that I didn't get enough rest.  Made me have a big bump on my head.  And there was

the time at the chicken plant, like whenever I like have like stress and get real stressed out or work real hard the seizure, like I could have a seizure then.  Because at the chicken plant that one day I remember I was working hard and it was - - I was - - I found myself on the floor and I was looking up at my boss and he - -

Q That's the chicken factory two and a half years ago that - -

A Yeah.

Q And this was somewhere - - this was more than two and a half years ago.

*   *   *

A Yeah, and I'm talking about the one that I had two and a half years ago.  That's what I'm talking about now.

Q I know.

A But I was looking up at the boss and I hit my head on the rail, the metal railing.  It left a big mark.  And my dad he owns his own construction people and it was one summer I was working with him on a roof and all of a sudden I went to get a pack of shingles and I kind of got clumsy and kind of was trembling, and my granddad was on the roof too, and dad said no more roof jobs for me.

Q How long ago was that?

A It's been probably two and three summer ago.  Yeah, two or three summers ago I think.  He didn't want me working on any more roofs because he knows like I can give them like a couple hours of good work and then once that's up I could - - it's just like too much strain on me.  And I get lightheaded and stuff and that's when my seizure could happen and I like blackout or something.

*          *          *

Q      Do you drive a car?

A      Yes, sir, I drive an, yes, sir, I drive an Explorer.

Q      And how frequently do you drive?

A      Just twice a week.

Q      And why - - what do you do the two times a week you drive?

A      I go to town and I just go to the bowling alley with my friends and I hang out there.

Q      Do you bowl?

A      Shoot pool mostly and I bowl some.

Q      Where is it, do they have pool tables at the bowling alley?

A      Yeah, yes, sir.

*          *          *

Q      Tell us now about a typical day.  What time do you get up?

A      10:00 or 10:30.  And I, after that I go down to my granddad's because he's, he's basically retired.  And I'll either go with him to town or wherever he goes or I'll hunt or a lot of time I'm on the computer down there.  And after that - -

Q      What do you do on the computer, do you surf the net?

A      Yeah, that and I'll be on instant messenger.

Q      You talking to your friends?

A      Yeah, yes, sir.  And after that, about 5:00 when my grandma comes home, a little bit after that I'll go to my house and I'll spend the rest of the evening up there just watching TV.

8

That's basically it.

Q    I'm sorry?

A    Watching TV.

Q    But you said there was something else.  Watching TV or something - -

A    Yeah.  Well, I'll feed the dogs and - -

Q    Do you help your parents with any of the housework?

A    A little bit but not too much.

Q    Did you ever?

A    (No audible response.)

Q    No?

A    I do some.  They try to get me to clean my room which is a mess part of the time, most of the time.  But I did manage to, while the WVU game was on I managed to clean most of it up.  I got a TV in my room.

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q    Mr. Ours, I believe you mentioned your job at the chicken factory.  How or why did that employment end?

A    They said that I was - - well, the boss just fired me basically because I, when I didn't like him - - well, that ain't it.  The reason why he fired me because I was kind of slow at it and I just didn't catch on as fast.  I wasn't as fast as the other people.  It like took me more to catch onto it than other people did.

Q    The job that you had at American Wood Market, the cabinetry factory, why did that employment end?

A    Well, I cut myself twice down there on - - it was like on two different things.  It was like with - - and also they put me on several jobs down at American Wood Market.  And one was like they tried making me use this one saw that it was very complicated to use and to get onto them.

*               *               *

Q    And how about the job at Dry Kill, that's a lumber factory.

A    Yeah.

Q    Why did you stop working there?

A    Well, the boss fired me because I could not like catch to it fast enough.  Because you had to put like this thick stem and I was like really clumsy and I couldn't catch - - I mean I put the sticks down and stuff.  But then they put me onto this banding thing where you had to like band all the lumber together and I couldn't comprehend how to like use that tool to band the sticks together.  And after - - and you had to - - because there was sticks coming out of a chute and if those sticks got backed up you've backed up the whole operation.  And then whenever he saw that he just - - they fired me over that.

Q    You said you arise in the morning at 10:00 or 10:30 a.m., what, on the average, what time do you retire at night?

A    Sometimes it'll be like 10:30 to 11:00 and sometimes I'll watch a movie, but 10:30 to 11:00.

ALJ    If you watch a movie what time do you go to bed?

CLMT    I'd say 11:00 to 11:30 but usually - - well, not every morning, the reason I get out of bed is because my granddad underneath, well, he lives underneath, well, below us, and

10

anyway, he calls up and I hear the phone because I've got a phone in my room. And whenever I hear that phone I know it's him and he calls up to ask if I'm out of bed yet. So he's the one that wakes me up.

*          *          *

Q        You indicated if you don't get enough sleep that throws you out of whack, so to speak, do you recall, or do you know from your own experience how much sleep you need to have before that happens?

A        I know I need like several good hours. I can pretty much tell when - - how much sleep I need or - -

Q        What does that mean, what's several good hours?

A        Well, like I can tell whenever I'm tired because I'll be like - - I can - -

ALJ        Your attorney wants you to give you - - give him a number - -

CLMT        Oh, okay.

ALJ        - - of hours.

CLMT        I'd say probably at least eight good hours.


BY ATTORNEY:

Q        And, not to ask you something that you've already testified to, but as far as napping you did mention that. I want to make sure I understand the frequency of that.

A        Yeah, like I got up at 6:00, well, a little bit before 6:00 this morning, and when we get home today I'm going to have to - -

Q        Well, today's unusual, you know - -

BY ADMINISTRATIVE LAW JUDGE:

Q        What about on a typical day, do you nap on a typical day?

A        Well, sometimes I do.

Q        Well, typical day, in other words [INAUDIBLE] not an occasional time, not once every now and then, but on - -

A        Well - -

Q        - - your usual day do you take naps?

A        On a usual day, well, it depends if it's hunting season.  Now if it ain't hunting season I usually do not nap on a typical day because I'm just normally at the computer.  I'll sleep in until 10:30 [INAUDIBLE] after 10:30.  Until that phone rings I'm still in the bed so.

Q        [INAUDIBLE] during hunting season?

A        In hunting season the hunting kind of, well, it's kind of exhausting so - -

Q        You go out hunting, do you?

A        Yeah, yes, sir.

Q        About how many hours do you go out hunting?

A        Well, it depends if I've killed anything.  And if I've killed several squirrels I'll keep on hunting until I like get several squirrels.  But if I haven't just like hunt for a little while I might take a little nap.  If - -

Q        Well, so how many hours do you spend out hunting?

A        I'd say probably three or four.

Q        After that you take a nap?

A        Yeah, yes, sir.

*          *          *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]

Q       Can you briefly give us the claimant's vocational training in terms of his past

relevant work?

A       Yes, Your Honor.  The first position was that at the chicken plant in keeping

poultry cooled down.  Major duty shoveling ice.  Classify this work medium exertional level,

unskilled.  All other past relevant work, factory worker primarily.  Light exertional level,

unskilled.  All past relevant work unskilled, no transferable skills.

Q       I'd like to ask you a hypothetical question or two.  For the first I'd like to ask

assume someone of the claimant's age, education, and work background.  Assume this person is

limited to light work, as that's defined in the Commissioner's regulations.  Assume further that

the - - no strenuous lifting or carrying.  No work at heights or around moving machinery.  Simple

one or two step operations requiring only minimal concentration with minimal stress.  Would

there be any work that would be available for this hypothetical person?

A       Yes, your Honor.  Looking at the light, unskilled occupations I offer the following

examples of occupations that I feel to be within the residual functional capacity.  The first

position would be that of machine tender.  In the United States there are 62,000 of these

positions.  In the local - -

Q       Wait, wait.  Okay.

A       In the local economy, I define the local economy as an area known as western

Maryland to include the adjacent portions of West Virginia and Pennsylvania.  I use

Cumberland, Maryland, as the central metropolitan statistical reporting area for analysis and

preparation of these proceedings.  In that local area 1500 of these positions exist.  The position of stock clerk.  In the United States - -

Q        Any strenuous activity in stock clerk?

A        Stock clerk, Your Honor, would be classified at the light exertional - -

Q        I know light.  But I was limiting the light saying no strenuous lifting or carrying, in other words, I was cutting down the light base.  But, so that, I mean there's no problem about walking and standing [INAUDIBLE] but there would be no real - - I mean the person would not be regularly lifting 10 to 20 pounds.

A        The - -

Q        That's what I meant by no strenuous lifting or carrying.

A        Okay, Your Honor.  The - -

Q        I'm not saying that this job - - I just want to make sure that in naming this job you've taken that into account.

A        Yes, Your Honor.  Not utilizing that as a position because of the possibility particularly of carrying in that job.

Q        Yeah.

A        I move - -

Q        [INAUDIBLE] - -

A        - - to the - -

Q        - - [INAUDIBLE] - -

A        - - position of packer and packaging worker.  In the United States 47,000 exist.  Locally 1200 of these positions are in existence.  A third example would be that of file clerk.

Nationally 76,000 exist, locally 1600 of these positions exist. I offer these as examples only, Your Honor. This is not intended to be an exhaustive list. And, again, for the record these come from the light, unskilled occupational base.

Q    So the - - are you familiar with the Commissioners' regulations which take administrative notice of the existence of 1400 unskilled, light occupations each of which constitute the number of jobs in the national economy?

A    Yes, Your Honor.

Q    Can you give us your expert opinion as to a percentage of those 1400 occupations that this hypothetical person could perform?

A    Your Honor, approximately 40% of the 1400 occupations remain within the residual functional capacity which translates into about 560 [INAUDIBLE] occupations remaining.

Q    I'd like to ask you a second hypothetical. And I'd like you to assume the same person as the first one. But I'd like you to assume this person is limited to sedentary work.

A    From the sedentary, unskilled occupational base I offer the following examples. First example would be that of quality control worker. In the United States 39,000 exist - -

Q    39,000.

A    In the local economy 1000.

Q    Okay.

A    The position of general clerical worker. Nationally 82,000 exist.

Q    Locally?

A    Locally 2100 of these positions exist. And a third example would be laundry

worker.  Nationally 46,000 exist.

Q        Local?

A        1200 of these positions are in existence.

Q        And these are examples [INAUDIBLE] exhaustive list?

A        This is - - these are presented as examples only, Your Honor.  It is not intended to be an exhaustive list of the occupations.

Q        Are you familiar with the Commissioner's regulations where she's taken administrative notice of the existence of 200 unskilled, sedentary jobs each of which constitute a significant number of jobs in the national economy?

A        Yes, Your Honor.

Q        Could you give us your expert opinion as what percentage of these 200 occupations [INAUDIBLE]?

A        Your Honor, approximately half or 50% would remain within the residual functional capacity of the hypothetical before me.

ALJ        Mr. Sherman.

ATTY        Thank you, Your Honor.

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q        Dr. Ryan, I have a question for you, and this probably is included in the Judge's previous hypothetical.  I just want to make sure, I think it is.  But at Exhibit 8F and 10F, if you were  [INAUDIBLE] moderate non exertional limitations, the ability to remember locations, work products, understand and carry out detailed instructions, maintain attention and concentration for extended periods, and to be able to work in coordination and proximity with

others without being distracted.  I guess, would that change anything or as that pretty much included within the previous restrictions in the hypothetical?

A        The - - it would not alter my opinion nor my testimony in terms of - -

Q        Sure.

A        - - in terms of the examples of the jobs.

*          *          *

ALJ          In other words, essentially, Dr. Ryan, what he's asking is how much productivity would a person, would this hypothetical person have to lose before there would be not work.  Is that what you're saying?

ATTY          That's fair, Your Honor, yes.

VE          Your Honor, it is my opinion that an individual who loses 20% of their productivity, and by this I mean they're performing at about 80% of those doing the same or similar duties on the job on a regular basis.  When this takes place it would render the individual not employable.

ALJ          Okay.  So that, so, in other words, what you're saying is that this person's productivity were cut by 20% there would be no work?

VE          Correct.

ALJ          Okay.  It's for me to determine if - -

ATTY          Yes, sir.

ALJ          - - [INAUDIBLE].

ATTY          Just one, Dr. Ryan, with regard to the previous hypothetical I understand that the hypothetical individual cannot - - should avoid heights and machinery.  If the

17

hypothetical individual would only - - would have difficulty, substantial difficulty and only rarely be able to balance would that change any of your results?

VE        No, it would not.

ATTY        Okay.  And you can tell me if this is a proper question or not, the past, hypothetically speaking, past success as far as working with limitations or being fired is that any, in the industry of vocational expertise, any future indicator of the likelihood of success at work in the future?

VE        The reason why an individual is discharged from a job is many and varied. Often their opinion as to why they were fired differs from what the actual circumstances are when you investigate.  So it would be impossible, from a vocational point with the information I have now, to make any assessment of that.

*            *            *

E.        Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearings and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affected his daily life.

• Cares for his own personal hygiene (Tr. 92)

• Prepares soups, frozen dinners, and sandwiches (Tr. 93)

• Does lawn care (Tr. 93)

• Shops for clothes, gifts, and snacks (Tr. 94)

• Watches television for three hours per day and listens to records and tapes for thirty minutes per day (Tr. 94)

- Goes fishing and participates in sporting events (Tr. 94)

- Goes to the movies (Tr. 94)

- Drives short distances (Tr. 134, 203)

- Participates in hunting (Tr. 209)

### III. The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant contends that the ALJ's decision is not supported by substantial evidence. Claimant did not individually number his assignments of error. The Court is mindful that since Claimant is proceeding *pro se*, it must read his arguments in a liberal fashion. <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972). The Court concludes Claimant has made the following three assignments of error against the ALJ's decision. First, Claimant contends the ALJ erred by not taking testimony from his father and mother. Second, Claimant argues the ALJ erred in calculating his residual functional capacity (RFC). Finally, Claimant contends the ALJ erred in finding Claimant could perform work in a region based from Cumberland, Maryland. Claimant contends he cannot commute from his home sixty five miles away.

Commissioner asks the Court to affirm the ALJ. Commissioner argues Claimant's counsel agreed Claimant's father and mother should not testify and so the ALJ did not commit legal error by not taking their testimony. Commissioner also argues substantial evidence supports the ALJ's decision regarding Claimant's limitations. Finally, Commissioner contends substantial evidence supports the ALJ's finding that a significant number of jobs exist in the national economy that Claimant can perform.

B.    <u>The Standards</u>.

1.    <u>Summary Judgment</u>.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  <u>Matsushita Elec.  Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson v.  Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

2.    <u>Judicial Review</u>.  Only a final determination of the Commissioner may receive judicial review.  <u>See</u>, 42 U.S.C. §405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir. 1986).

3.    <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears the burden of showing that he has a medically determinable impairment that is so severe that it prevents him from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

4.    <u>Social Security - Medically Determinable Impairment</u>.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§

404.1508, 416.908.

5.       <u>Disability Prior to Expiration of Insured Status- Burden</u>. In order to receive disability insurance benefits, an applicant must establish that he was disabled before the expiration of his insured status. <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.       <u>Social Security - Standard of Review</u>. It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.       <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>. The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.       <u>Social Security - Substantial Evidence - Defined</u>. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.       <u>Social Security - Sequential Analysis</u>. To determine whether Claimant is

disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether he has a severe impairment, 3) whether his impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform his past work; and 5) whether Claimant is capable of performing any work in the national economy. Once Claimant satisfies Steps One and Two, he will automatically be found disabled if he suffers from a listed impairment. If Claimant does not have listed impairments but cannot perform his past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.    Discussion

I.

The ALJ's Decision Not to Take Testimony from Claimant's Parents

Claimant first argues the ALJ erred by not asking his parents to testify. Claimant states that since his parents possess the greatest familiarity with his medical problems, the ALJ should have sought their testimony. Commissioner points out Claimant's counsel agreed Claimant's parents did not need to testify.

It has been stated that "When an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making his strongest case for benefits." Glenn v. Sec'y of Health & Human Servs., 814 F.2d 387, 391 (7th Cir. 1987). A claimant bears the burden of proof before step five of the disability determination process because "he is in a better position to provide information about his own medical condition." Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987).

In this case, Claimant's counsel told the ALJ that Claimant's parents were present, but their testimony was not necessary. (Tr. 212). Counsel stated that Claimant's father was at the hearing, but "I didn't bring him in obviously for the apparent reasons. And his mother is also present by obviously they would say the same thing so there's no use bringing two in. And I'm not sure that you want to hear from either of them." (Id.). Counsel declined to call Claimant's parents to testify. Claimant may not now assign error to the ALJ.

## II.

### The RFC the ALJ Assigned to Claimant

Claimant next contends the ALJ erred in determining his residual functional capacity. Commissioner contends the ALJ's decision has support in the record.

The RFC is what Claimant can still do despite his limitations. 20 C.F.R. § 404.1545. It is an assessment based upon all of the relevant evidence. Id. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition. Id. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used. Id. These descriptions and observations must be considered along with medical records to assist the Social Security Administration to decide to what extent an impairment keeps a claimant from performing particular work activities. Id. This assessment is not a decision on whether a Claimant is disabled, but is used as a basis for determining the particular types of work a claimant may be able to do despite his impairments. Id. The ALJ's findings will be upheld as long as substantial evidence exists to support them. Hays, 907 F.2d at 1456.

The ALJ determined Claimant could perform light work with limitations. (Tr. 22). He

could occasionally lift twenty pounds and frequently lift ten pounds.  (Id.).  Claimant had limitations in concentration.  (Id.).  The ALJ limited him to performing one or two step tasks involving minimal amounts of concentration and stress.  (Id.).  Claimant could not work around heights or moving machinery.  (Id.).

The Court concludes substantial evidence supports the ALJ's decision.  The ALJ correctly noted that two residual functional capacity assessments found Claimant had few physical limitations.  (Tr. 18, 143-47, 171-75).  Both determined Claimant had no exertional limitations.  (Tr. 144, 172).  One found Claimant had no postural limitations and the other determined Claimant had only one postural limitation in an inability to climb ladders, ropes, and scaffolds.  (Tr. 145, 173).  Claimant had limitations regarding hazards. (Tr. 147, 175).  The ALJ also properly stated that during an evaluation by Dr. Beard, Claimant had the ability to speak comprehensibly, listen, and follow instructions.  (Tr. 18, 140).  Furthermore, regarding Claimant's mental limitations, the ALJ credited the opinion of Dr. Kuzniar over the opinion of Dr. Goots, even though Dr. Goots stated Claimant's mental impairments were not severe.  (Tr. 19, 151, 179).  Dr. Kuzniar stated in another assessment that Claimant has little limitation in his ability to work within a schedule, regularly attend work, and be punctual.  (Tr. 166).  Claimant had no limitation in his ability to comprehend and carry out short, simple instructions.  (Id.).  He had moderate limitations in his ability to carry out detailed instructions or maintain concentration for long periods of time.  (Id.).  He also had a moderate limitation in his ability to complete a normal working week without interference from mental impairments.  (Tr. 167).  The ALJ's RFC is consistent with these limitations.  Thus, the Court finds substantial evidence supports the ALJ'S RFC.  The ALJ should be affirmed in this regard.

## III.

### The ALJ's Determination that Significant Numbers of Jobs Exist Claimant Can Perform in the Cumerbland, Maryland Region

Finally, Claimant challenges the ALJ's determination that significant numbers of jobs exist in the economy that Claimant can perform.  Claimant contends that while the Vocational Expert identified jobs in the Cumberland, Maryland region, that is a significant distance from Claimant's home.  Claimant contends he cannot commute the sixty five miles between his home and Cumberland.  Commissioner argues the ALJ obtained evidence of a significant amount of jobs Claimant could perform.  Commissioner states that whether significant numbers of jobs exist in Claimant's immediate area is irrelevant as long as significant numbers of jobs exist in the national economy.

The statute applicable to the issue here provides that to avoid an award of benefits, Commissioner must show "work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).  In Hicks v. Califano, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979), the Fourth Circuit stated (albeit in a footnote) that 110 regional jobs represents a significant number of jobs under the statute.

It is questionable whether basing the local economy sixty five miles from Claimant's residence is appropriate.  In Meeks v. Apfel, 993 F. Supp. 1265, 1275 (W.D. Mo. 1997), the court found ninety miles from the claimant's home an appropriate region.  On the other hand, in Ramos v. Richardson, 373 F. Supp. 260, 262 (D.P.R. 1973), the court determined the a region represented an area fifty miles from the claimant's residence.

Nevertheless, the statute permits Commissioner to demonstrate significant numbers of jobs in the national economy without reference to a claimant's local economy.  It is axiomatic

that unambiguous statutory language controls.  <u>Exxon Mobil Corp. v. Allapattah Servs., Inc.</u>, 545 U.S. 546, 568 (2005).  The plain terms of the statute permit Commissioner to show jobs "*either* in the region where such individual lives *or* in several regions of the country."  42 U.S.C. § 423(d)(2)(A) (emphasis added).  The statute is phrased in the alternative.

A number of courts have interpreted the statute in this manner to permit Commissioner to deny disability benefits where the evidence shows significant numbers of jobs in the national economy, regardless of whether such jobs exist near the claimant.  In <u>Allen v. Bowen</u>, 816 F.2d 600, 603 (11th Cir. 1987), the claimant offered new evidence to show significant numbers of jobs did not exist for him at the local level.  Yet the court held that "The appropriate focus under the regulation, however, is the national economy.  Thus, even if Allen's evidence were credible to the lack of jobs in his geographic area, his failure to disprove the existence of such jobs on a national scale would leave the ALJ's finding intact."  <u>Id.</u> at 603 (citations omitted).  In <u>Dressel v. Califano</u>, 558 F.2d 504, 508-09 (8th Cir. 1977), the court held that Commissioner need not demonstrate "that the job opportunities existed within the local area, but only that job opportunities exist in the national economy."

In this case, Commissioner demonstrated a large number of jobs suited to Claimant's RFC exist in the national economy, even if they do not exist in the immediate area where Claimant resides.  The Vocational Expert testified 62,000 machine tender positions exist.  (Tr. 214).  There are 47,000 packer and packaging worker positions and 76,000 file clerk jobs.  (Tr. 215).  More jobs exist at the sedentary level.  There are 39,000 quality control worker positions, 82,000 general clerical worker jobs, and 46,000 laundry worker jobs.  (Tr. 216).  The ALJ noted this in his opinion.  (Tr. 23).  The ALJ satisfied his burden at this step and should be affirmed.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.       Claimant's Motion for Summary Judgment be DENIED.

2.        Commissioner's Motion for Summary Judgment be GRANTED because Claimant's attorney determined Claimant's parents did not need to testify at the administrative hearing, substantial evidence supports the RFC the ALJ assigned to Claimant, and the ALJ demonstrated a significant number of jobs Claimant can perform in the national economy.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to the pro se Plaintiff.

DATED: August 15, 2007

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE